THIRD DIVISION

 MARCH 31, 2000

1-98-0900

THE PEOPLE OF THE STATE OF ILLINOIS,   )  Appeal from the

     )  Circuit Court of

Plaintiff-Appellee, )  Cook County

)

v. )

) 

DERRICK TERRY, )  Honorable Daniel J.

)  Kelly, Judge

Defendant-Appellant. )  Presiding.

JUSTICE CERDA delivered the opinion of the court:

One of the main issues in this case is whether the comments made during the State's opening and closing arguments deprived 
defendant
, Derrick Terry, of a fair trial.

Defendant appeals after a jury trial from his convictions for first-degree murder and aggravated battery.  He argues in part that his right to a speedy trial was violated, that his guilt was not proven beyond a reasonable doubt, and that his trial was unfair due to inadmissible evidence and/or improper remarks of the State concerning (a) 
defendant
 being a member of a gang that dealt drugs, (b) the prior consistent statements of the sole-testifying eyewitness identifying defendant at the trials of the two co-defendants, and (c) 
defendant's 
threats against the eyewitness and another State witness.  We agree that 
defendant's trial was unfair, and we 
reverse 
defendant's convictions 
and remand for a new trial. 

FACTS

On October 26, 1995, the murder victim and Bennie Hogue were painting a house on the 1800 block of South Kedzie in Chicago. Shots were fired by three people at a passing car.  The victim was hit and killed.  Bennie Hogue was wounded.

Defendant was arrested and, on the 116th day of the statutory speedy-trial term, the State moved for an extension of the term so that the State could continue to search for Lonnie Walker, one of the passengers in the car who were the targets of the shooting.  The State claimed that Walker was an essential witness.  

Thomas Quinn, a State's Attorney investigator, testified for the State on its motion that he was first asked in early October 1997 to locate Walker to serve him with a subpoena for court dates that month.  Walker had been released from jail in September to a rehabilitation program but left without permission on October 5, 1997.  Ever since Walker had fled, Quinn and three other investigators had been looking for him at several locations, including the homes of relatives.  The State believed that, if a warrant were issued for Walker's violation of parole, it would be extremely helpful to the State in finding him. 

Over 
defendant's objection, 
the trial court extended the speedy-trial term 30 days until January 20, 1997, and on that day, the trial commenced.  
 

D
efendant
 moved 
in
 
limine
 to prohibit reference at trial to drug dealing and gang membership.  The motion was denied.  

Bennie Hogue testified at trial that he spent the day on October 26, 1995, with Joe Hegwood painting the exterior of a house at 1840 S. Sawyer Street.  As he was working, he observed across the street a group of five young men standing in a vacant lot most of the day.  At about 5:30 p.m., he heard about 35 gunshots.  He was hit by several bullets, but he did not see who was shooting.  

A medical examiner testified that Hegwood died from the gunshot wounds that were inflicted during this incident.

Calvin Horton testified at trial, over 
defendant's objection, that 
in 1995 he observed drug dealing on a daily basis on the 1800 block of south Sawyer Street.  He knew men who frequented that block; they included defendant (nicknamed "D-

Man")
, Ardell Washington, 
and Derrick Johnson.  He did not testify that these men were drug dealers or gang members.

Calvin 
further testified that
, on October 26, 1995, in the late afternoon, he was near the vacant lot on the 1800 block of South Sawyer Street.
  He heard Washington tell 
defendant, 
Johnson, 
and some others to watch out for a gray station wagon.  John Carter left in a car and, upon his return, gave a gun to defendant and a handgun to Washington.  The gray station wagon then drove by and stopped by the vacant lot.  Washington announced, "Here comes the gray station wagon."  Washington, Johnson, and defendant shot at the car.  

Calvin 
further testified that
 he ran toward his home at 1855 S. Kedzie Avenue.  Washington, who had
 borrowed Calvin's coat earlier, threw the coat up on Calvin's porch before running off.  
Calvin's 
mother called the police who, upon their arrival,  searched the home and found the coat that Calvin had loaned to Washington.  Calvin was taken in for questioning at the police station, where he remained for two days.  He told a detective O’Connor that Washington and D-Man had been shooting and that he was not sure of D-Man's real name.  

Calvin 
further testified that
 he gave a six-page statement to an assistant State's Attorney while at the station; he was allowed to make changes to the statement, and he signed it.  
Although he also told the assistant State's Attorney that D-Man was one of the shooters, the assistant State’s Attorney wrote down the wrong names of Terry Sykes and Derrick Knight.
  He later found out that D-Man's real name was Derrick Terry, and they made the correction on his statement
.

[Calvin's statement is not in the record, but according to a reading of the statement by a witness at trial, 
the statement named only Washington and Johnson as the shooters and named Terry Sykes as a person who had been running with a gun which Calvin could not tell if Sykes shot. 
 The statement did not refer to a Derrick Knight.
  The statement recited that D-Man was only present in the vacant lot prior to the shooting; it did not state that D-Man was one of the shooters.]

Calvin 
stated
 that
 he testified and identified 
defendant as the shooter at the prior
 trials of Johnson and Washington, who were the co-defendants for this murder.

Calvin 
further testified that
 he did not recall being introduced on July 24, 1996, to public defender Debbie Grohs in the company of a Peter "Sanifelt" [
sic
].  He also denied telling Grohs that he did not actually see who fired shots.  

Detective Terrence O'Connor testified that Calvin told him on the evening of the shooting, in an interview with O'Connor's partner, that he saw Washington, Johnson, and Sykes shooting.  Calvin did not at that time tell him that D-Man was shooting, but 
Calvin referred to 
defendant
 as Terry Sykes and stated during the interview with the assistant State's Attorney that 
he knew D-Man as Terry Sykes. 

Officer Kathleen McKenna testified that she spoke to Calvin the night of the shooting and that he stated that the first name of a shooter was Derrick but that he was not sure of the last name although he thought it was Knight.  Horton did not give her any other names.  

Assistant State's Attorney Tom Kouglas, who took Calvin's statement on October 28, 1995, testified, in contradiction to Calvin's testimony, that Calvin 
did not state that D-Man was one of the shooters.  Calvin did tell him that the real name of D-Man was Derrick Terry.

Peter Sonnefeldt testified that he formerly worked with the Cook County public defender’s office as a criminal investigator.  On July 24, 1996, he and attorney Debra Grohs were interviewing people concerning the shooting.  Grohs interviewed Calvin, who 
said he heard the shooting but saw nothing.  

Chicago police officer Daniel Vargas testified that, prior to October 26, 1995, he was told by witnesses to the shooting that two offenders ran into 1855 S. Kedzie, where Calvin lived. Calvin was shown to one witness, who said that he was not one of the shooters.  He also testified, without objection, that the 1800 and 1900 blocks of South Sawyer were known for high-volume narcotics sales.
 

Defendant attempted to have the testimony of Zeta Horton, the mother of Calvin, barred because the State notified 
defendant 
only the day before that she would identify 
defendant as having had a gun at the scene.  At the hearing on 
defendant
's motion, she testified that she did not remember when and to whom she gave the information about her identification of 
defendant.  The first time she told someone it was over the telephone in a call to the State's Attorney's office and it was "a while back."  The trial court denied the motion.

Zeta Horton testified at the trial that she looked out her front window when she heard the gunfire.  She saw Calvin coming towards the house, and she saw defendant on the other side of him with a gun in his hand.  
She knew then that defendant's name was Derrick Terry.  
When the police arrived, she did not tell them that she saw defendant with a gun even though she was aware that someone had been shot.  She went to the police station the second day, but she still did not tell anybody at the station that she saw defendant with a gun.  

Zeta 
further testified that
 she had not wanted to get involved because she was scared.  
She did not remember the date, but at some time before she testified in co-defendant Washington's trial, she told the assistant State's Attorneys that she saw 
defendant
 with a gun.  She also testified at one point that she had not directly told the assistant State's Attorneys in person about 
defendant 
until the day before 
defendant
's trial
. 

Zeta 
further testified that
 she received threats related to this case that were communicated to her through her relatives. There were many threats of hurting them and burning the house if her son testified.  
On one occasion, someone tried to enter her home through a window.  
She reported it to the police as well as an incident in which someone was sliding on the roof next door. 

The jury found 
defendant
 guilty of murder and aggravated battery with a firearm.  He was sentenced concurrently to 50 years' imprisonment for the murder and to 20 years' imprisonment for the aggravated battery.  He appealed.

ANALYSIS

I.  Speedy Trial

Defendant argues that he was denied a speedy trial as mandated by the Speedy Trial Act (725 ILCS 5/103-5 (West 1996)) because the State did not show diligence in locating the witness Lonnie Walker and made no showing of any likelihood that he could be found.  There is no dispute that Walker was a material witness.

Persons in custody are to be tried within 120 days unless delay was occasioned by the 
defendant.  725 ILCS 5/103-5(a) (West 1996).  The standard for continuing the case upon the State's application is set forth in the Act:

"
(c) If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days."  725 ILCS 5/103-5(c) (West 1996).

The decision whether to grant an extension under this statute is within the trial court's discretion, which will not be disturbed absent a clear showing of abuse.  
People v. Smith
, 268 Ill. App. 3d 1008, 1012, 645 N.E.2d 384 (1994).
  On review, the court should examine the entire record as it existed at the time the trial court considered the motion for continuance.  
People v. Hughes
, 274 
Ill. App. 3d
 107, 111, 653 N.E.2d 818 (1995).  

 The test of diligence is whether the State commenced its efforts to locate the witness in sufficient time to secure his presence before the speedy-trial term expired.  
Smith
, 268 Ill. App. 3d at 1013.  Several investigators had been extensively searching for Walker to obtain his presence at court since Walker's disappearance in October 1997.  We conclude that the granting of an extension was not an abuse of discretion and that 
defendant
 was not denied his right to a speedy trial. 

II.  Gang Membership and Drug Dealing 

Defendant argues that he was deprived of a fair trial because (1) the State made inflammatory remarks in opening and closing argument, not based on the evidence, that defendant was a member of a gang that was dealing drugs; and (2) 
improper evidence was admitted that there was frequent drug dealing on the block where the shooting occurred.  

The pertinent remarks of the State in opening arguments are as follows: 

"
[D]efendant and his cohorts
 were in that empty lot 
plying their trade
.  
Selling drugs
."  [An objection was overruled.]  
To anyone that would buy them
. 

***

You'll hear how Calvin Horton was *** approached by 
the guy who was running the dope spot
.  His partner, Ardell Washington. [No objection]
 (Emphasis added.)"  

The pertinent remarks of the State in closing argument are as follows:

     "Zeta Horton. *** She told you why she hadn't come forward.  She told you she was protecting her family.  

       ***  You try living in the vacant lots, the burned out buildings and the 
drug infested neighborhoods
 in this city.  And you tell me that you're going to stand up to the likes of 
this drug dealer
.  

MR. KATZ: Objection.

MR. KOPEC: 
And his gang of buddies
.

MR. KATZ: There is no evidence Derrick Terry ever dealt drugs.

THE COURT: Sustained.

MR. DOSCH: Could I ask the jury be admonished your Honor.

THE COURT: Ask you to disregard the statement.

MR. HUGHES: You heard Calvin Horton tell you 
the

guys out in that lot were dealing drugs
.  You heard Officer Vargas tell you that it is 
a high narcotics activity area
.  
These guys are out there protecting their turf
. [defense objection sustained]

MR. HUGHES: *** They kill an innocent 72-year-

old man *** 
because they're trying to protect their turf
. [defense objection overruled] (Emphasis added.)" 

The regulation of opening statements and closing arguments is within the trial court's discretion, and its determination of the propriety of remarks will not be disturbed absent a clear abuse of discretion.  
People v. Groves
, 287 
Ill. App. 3d
 84, 96, 677 N.E.2d 1351 (1997).  

In metropolitan areas in America there may be strong prejudice against street gangs.  
People v. Smith
, 141 Ill. 2d 40, 58, 565 
N.E.2d
 900 (1990); 
People v. Parrott
, 40 Ill. App. 3d 328, 352 N.E.2d 299 (1976). 
 Evidence of gang membership is admissible only if it is relevant such as to prove common purpose or design or to provide a motive for an otherwise inexplicable act.  
Smith
, 141 Ill. 2d at 58.  A 
defendant
 cannot automatically be assumed to be guilty based on his membership in an undesirable group.  
People v. Matthews
, 299 
Ill. App. 3d 
914, 923, 702 N.E.2d 291 (1998).

When 
the State's theory of gang-related motive is not supported by the evidence, the only purpose for telling the jury that the crime was gang-related could be to inflame the passion or to arouse prejudice against gangs.  
Smith
, 40 Ill. 2d at 62. 
 
 
 
 Calvin Horton, the sole-testifying eyewitness, did not testify about the reason for the shooting incident.  
There was no evidence that gang slogans were shouted or that gang signs were flashed.  There was no testimony that a previous gang-related encounter precipitated the shooting. 
We reject the State's argument that it was a reasonable inference that 
defendant 
was involved in gang-related activity from the facts that 
defendant
 and a group frequented a block in a high-drug-traffic area and that the group was there most of the day of the shooting.  Nor do we agree that the actions of the person in handing out the guns and announcing the car's arrival was necessarily evidence of gang activity of the group.
  
It must be concluded that there was no evidence at all that
 
defendant was a member of a gang or that 
the shooting occurred as a result of a gang's protection of its drug turf or for another gang-related reason. 

The fears and prejudices of the jurors can also be aroused by improper reference to drug dealing.  
People v. Montgomery
, 254 
Ill. App. 3d
 782, 795, 626 N.E.2d 1254 (1993). 
 
Statements that a defendant was involved in other crimes is highly prejudicial because they are likely to create an image of defendant as a bad person.  
People v. Speight
, 222 Ill. App. 3d 766, 770, 584 N.E.2d 392 (1991), 
rev'd on other grounds
, 153 Ill. 2d 365, 606 N.E.2d 1174 (1993); 
People v. Mikyska
, 179 Ill. App. 3d 795, 804, 534 N.E.2d 1348 (1989)
.

The only evidence of drug dealing was that it had frequently taken place in the area of that block.  Calvin Horton did not testify that the group was selling drugs.  We reject the State's argument that it was a reasonable inference that the group was dealing drugs that day.  

We next address the State's opening and closing arguments about gang membership and drug dealing.  

It is impermissible for a prosecutor to comment during opening statements upon what testimony will be introduced at trial and then fail to produce that testimony since such an argument is in effect an assertion of the prosecutor's own unsworn testimony in lieu of competent evidence.  
People v. Bunning
, 298 
Ill. App. 3d
 725, 729, 700 N.E.2d 716 (1998).  
 

In closing argument, 
a prosecutor has wide latitude and may argue to the jury facts and reasonable inferences drawn from the evidence (
People v. Kliner
, 185 
Ill. 2d
 
81, 151, 705 N.E.2d 850 (1998)), but a closing argument that is not based upon the evidence lacks a proper foundation and is thus improper (see 
People v. Henderson
, 142 Ill. 2d 258, 324-25, 568 N.E.2d 1234 (1990)).  It is improper for a prosecutor at final argument to argue assumptions or facts not based on the evidence or to say anything in argument the only effect of which will be to inflame the passion or prejudice of the jury against defendant without throwing any light on the question for decision.  
People v. Rivera
, 277 Ill. App. 3d 811, 821, 661 N.E.2d 429 (1996).

The State improperly argued in opening statements that 
defendant
 and the others were selling drugs because it never produced such evidence.  The State continued to maintain in closing argument that 
defendant
 and the others were selling drugs; in addition, the State argued they shot at the car to protect their drug-selling "turf."  The use of the phrase "gang of buddies" in closing argument implied that 
defendant
 was a gang member.  We conclude that the only purpose for the State to argue that defendant was a drug dealer and that the group was dealing in drugs was to inflame the passion and prejudice of the jury in order to obtain a conviction.

We next address if the State's remarks were reversible error.

Improper remarks require reversal only if they substantially prejudice 
defendant.  
Kliner
, 185 
Ill. 2d at 151-52.  
It has been held that a prosecutor's improper remark in closing argument does not prejudice a 
defendant
 where the trial court immediately instructs the jury to disregard the remark and later instructs the jury that closing arguments are not evidence and that it should disregard arguments not based on the evidence.  
E.g.
, 
Kliner
, 185 Ill. 2d at 159-60.  However, it can be concluded in an appropriate case that the sustaining of objections to the improper remarks of the State did not cure the error where the misconduct was flagrant and tainted the entire trial.  
E.g.
, 
People v. Aguirre
, 291 
Ill. App. 3d
 1028, 1035-36, 684 N.E.2d 1372 (1997) (the State argued facts not in evidence, among other conduct).
 

 The trial court did sustain 
defendant's objection 
to the remark in closing argument that defendant was a drug dealer 
and 
did advise the jury to disregard the remark.  However, the trial court inconsistently overruled an objection made by defendant to the State’s remark in closing argument that the group, of which defendant was a part, was a gang protecting its drug-selling turf.  
Therefore, the jury was permitted to consider prejudicial remarks. 

The improper argument was especially serious because 
the evidence of defendant's guilt was not overwhelming.  
See 
People v. Hayes
, 183 
Ill. App. 3d
 752, 757-58, 539 N.E.2d 355 (1989) (reversal was mandated because the evidence was not overwhelming and rested largely on the victim's credibility)
.  The conviction rested largely on the testimony of one eyewitness, and there was evidence that he did not consistently identify 
defendant
 as one of the shooters to the police, to an assistant State's Attorney, and to an investigator for a public defender.  
There were also credibility concerns about the other occurrence witness--Zeta, who was the eyewitness's mother.  She testified that she did not tell the police right after the shooting that she saw 
defendant
 with a gun, and there was some evidence that she did not directly tell the State about 
defendant
 until just before 
defendant
's trial.  We conclude that the prosecutor’s comments about gang membership and drug dealing were reversible error. 
 See 
People v. Goldsberry
, 259 
Ill. App. 3d
 11, 17-19, 630 
N.E.2d
 1113 (1994) (an unsupported State theory of gang-related motive may be grounds for a new trial).    

Although we are reversing and remanding for a new trial based on the evidence and remarks concerning drug dealing and gang membership, we next address two additional issues because they concern egregious errors that might otherwise reoccur on retrial.  
People v. Howard
, 305 
Ill. App. 3d
 300, 309, 712 N.E.2d 380 (1999).  We note that 
the Illinois Supreme Court has recently emphasized that prejudice to a 
defendant's case is not the sole concern upon review because even a guilty 
defendant
 is entitled to a fair trial.  
People  Blue
, No. 84046, slip op. at 31
 (January 27, 2000).  Not only does an unfair trial deny a 
defendant
 due process but it undermines the integrity of the judicial process.  See 
Blue
, No. 84046, slip op. at 31-32.  

III.  Prior Consistent Statements

Defendant also asserts as prejudicial (1) the evidence that Calvin Horton consistently identified 
defendant 
at the prior trials of the co-defendants and (2) the closing arguments concerning the prior consistent statements.

The admission of evidence is within the sound discretion of the trial court, and its ruling will not be disturbed unless there was an abuse of discretion.  
People v. Beard
, 273 
Ill. App. 3d
 135, 142, 652 N.E.2d 465 (1995).

The general rule is that evidence that a witness made a prior statement consistent with his trial testimony is inadmissible for the purpose of corroborating the trial testimony.  
People v. Shum
, 117 Ill. 2d 317, 340, 512 N.E.2d 1183 (1987).  
This evidence serves to unfairly enhance the credibility of a witness; 
a jury is more apt to believe something that is repeated. 
 
People v. Henderson
, 142 Ill. 2d 258, 314, 568 N.E.2d 1234 (1990)
; 
People v. Montgomery
, 254 
Ill. App. 3d
 782, 792, 626 N.E.2d 1254 (1993).

One of the exceptions to the general rule that is possibly applicable here is for prior consistent statements that rebut a charge that the witness is motivated to testify falsely.  
People v. Emerson
, 97 Ill. 2d 487, 501, 455 N.E.2d 41 (1983).  The consistent statement must have been made before the motive to testify falsely came into existence.  
People v. Titone
, 115 Ill. 2d 413, 423, 505 N.E.2d 300 (1987).  

During a portion of the defense's cross-examination, 
defendant
 attempted to damage Calvin Horton's credibility.  For example, 
defendant
 elicited that Calvin was taken for questioning to the police station where he remained for two days.  In addition, 
defendant
 elicited that Calvin could have revised errors in his written statement and did in fact make some revisions.  Furthermore, Calvin was asked if he had told a public defender that he had not seen who fired the shots.  

On redirect examination, over an overruled defense objection, the State asked about whom Calvin identified in the prior trials as the shooters--and, in doing so, put great emphasis on the three times that Calvin had identified 
defendant 
in court.  The State incorrectly argues that the defense first elicited evidence of the prior consistent statements.  
In cross-

examining Calvin
, the defense referred at trial to Calvin testifying at the prior trials of the co-defendants, but 
defendant 
did not bring out th
e fact that Calvin identified 
defendant
 at the prior trials.
 
 
The defense therefore did not open the door to this line of questioning. 
 

We find that the State improperly 
questioned Calvin Horton about whether he consistently identified 
defendant
 at the prior trials and that the evidence did not come under the exception for rebutting a motive to testify falsely.  The prior consistent statements were not made until after Calvin arguably had a motive to testify falsely--upon his questioning at the police station over a two-day period, which may have meant that he was a suspect.  
We hold that the trial court abused its discretion in permitting the evidence of prior consistent statements and argument thereon; they served only to bolster the credibility of the single eyewitness by corroborating his testimony. 

In addition, the State made closing remarks about the prior consistent testimony.
  Over defense objection, the State remarked that Calvin had consistently testified three times at the trials of 
defendant
 and the co-defendants "under a grueling cross examination."  Also the State twice made the argument that, if Calvin had said something inconsistent at the prior two trials, the defense would have pointed it out to the jury.  
These remarks exacerbated the evidentiary error by emphasizing the prior consistent testimony.

IV.  Threats to State's Witnesses

Defendant asserts as prejudicial the State's remarks in closing argument that 
defendant
 threatened the Hortons because there was no evidence that he did so.

The prosecutor argued that Zeta was threatened, that "they" tried to break into her house, that Zeta did not come forward earlier because she was protecting her family, and that Zeta was afraid "these people" would do something to her.  The prosecutor also stated that Calvin came to court "under great threats," to which an objection was overruled.  After referring to the drug-

infested neighborhoods of the city, the prosecutor stated, "And you tell me that you're going to stand up to the likes of this drug dealer."

In the following section of the State's closing argument, the trial court first overruled and then sustained defense objections to argument that the Hortons were in danger, which may have confused the jury as to whether it could consider the argument:

"You can imagine what it's like for them [Calvin and Zeta Horton] to sit in this witness stand knowing that their lives will be in jeopardy.

MR. KATZ: Objection.

MR. HUGHES: Every day.

THE COURT: Overruled.

MR. HUGHES: After their testimony.

MR. KATZ: Objection, there is no evidence of that.

THE COURT: Sustained."  

The State's closing argument clearly suggested that 
defendant 
threatened or intimidated the Hortons so that they would not testify against him.  
However, this argument was not based on the evidence because (1) Calvin did not testify that he was threatened not to testify against 
defendant and (2) 
although Zeta believed that the threats to her were related to the case, there was no evidence that it was 
defendant
 who instigated the threats.
 
 These closing argument remarks were inflammatory.  See 
People v. Mullen
, 141 Ill. 2d 394, 405, 566 N.E.2d 222 (1990) (prosecutorial comments which suggest that witnesses were afraid to testify because 
defendant
 had threatened them, when not based upon any evidence in the record, are highly prejudicial and inflammatory)
.
  We hold that the trial court abused its discretion in permitting the closing argument about 
defendant
 making threats.

We find that a combination of errors occurred during this trial which may have coerced the jury into returning a verdict more likely grounded in sympathy than a dispassionate evaluation of the facts.  
People v. Whitlow
, 89 Ill. 2d 322, 339-41, 433 
N.E.2d
 629 (1982).  The constitutionality of defendant's trial is in doubt, and we reverse and remand for a new trial.  A new trial is necessary to preserve the trustworthiness of the judicial process.  The evidence proving defendant's guilt was far from overwhelming.  It depended heavily upon the inconsistent statements of Calvin Horton.  We hold that defendant did not receive a fair trial.  134 Ill. 2d R. 615(a); 
People v. Keene
, 169 Ill. 2d 1, 17, 660 
N.E.2d
 901 (1995).

  
 V.  Reasonable Doubt

Defendant
 next argues that his guilt was not proven beyond a reasonable doubt.  

In reviewing a challenge to the sufficiency of the evidence to convict, the standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Buss
, 187 Ill. 2d 144, 211, 718 N.E.2d 1 (1999). 

Defendant argues that Calvin Horton did not identify him while being questioned by the police
, which was when it was most natural to do.  However, the jury could have believed 
Calvin's testimony that he did tell the police and the assistant State's Attorney that D-Man was one of the shooters even though his statement did not so state.  Even if Calvin's inconsistent statements cannot be explained away merely by an error by the assistant State's Attorney or by confusion over the nicknames and real names of the third shooter, the jury could still have found Calvin's testimony identifying 
defendant 
to be credible.  His inconsistent statements were matters to be weighed by the jury.  
People v. Cook
, 129 Ill. App. 3d 531, 534, 472 N.E.2d 856 (1984). 

Defendant also argues that Zeta's testimony was suspect and unreliable because she did not identify 
defendant
 to the police shortly after the shooting.  However, the jury could have believed Zeta's explanation that initially she did not want to get involved because she was scared. 
 Even aside from her testimony, 
we conclude that there was sufficient admissible evidence for the jury to have found guilt beyond a reasonable doubt.  Therefore, in light of our finding of reversible error, we remand for a new trial.

The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for a new trial.

Affirmed in part and reversed in part; cause remanded.

WOLFSON and BURKE, JJ., concur.